**Electronically Filed
Intermediate Court of Appeals
29729
15-APR-2013
09:39 AM**

NO. 29729

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

GROUP BUILDERS, INC., and
TRADEWIND INSURANCE COMPANY, LTD.,
Plaintiffs-Appellants/Cross-Appellees/Cross-Appellees,
v.
ADMIRAL INSURANCE COMPANY,
Defendant-Appellee/Cross-Appellant/Cross-Appellee,
and
NATIONAL INTERSTATE INSURANCE COMPANY,
SERVCO INSURANCE SERVICES CORP., formerly known as
and/or doing business as American Insurance Agency, Inc.,
and American Insurance Agency;
NATIONAL INTERSTATE INSURANCE COMPANY OF HAWAII, INC.,
Defendants-Appellees/Cross-Appellees/Cross-Appellants
and
ZURICH AMERICAN INSURANCE COMPANY,
Defendant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 05-1-2204)

MEMORANDUM OPINION
(By:  Foley, Presiding J., Fujise and Ginoza, JJ.)

In this insurance coverage dispute arising from a
construction-defect lawsuit, Plaintiffs-Appellants/Cross-
Appellees/Cross-Appellees Group Builders, Inc. (Group Builders)
and Tradewind Insurance Company, Ltd. (Tradewind) (collectively,
Plaintiffs) appeal from the Partial Final Judgment entered on

March 20, 2009, by the Circuit Court for the First Circuit[1] (circuit court).

Defendant-Appellee/Cross-Appellant/Cross-Appellee Admiral Insurance Company (Admiral) cross-appeals from the Partial Final Judgment entered in the circuit court on April 7, 2009.

Defendants-Appellees/Cross-Appellees/Cross-Appellants National Interstate Insurance Company, Servco Insurance Services Corp., and National Interstate Insurance Company of Hawaii, Inc. (collectively, National)[2] cross-appeal from the Partial Final Judgment entered in the circuit court on April 9, 2009.

Plaintiffs had earlier appealed from six circuit court orders and Admiral and National had cross appealed. That appeal was docketed as Case No. 29402. This court partially dismissed Plaintiffs' appeal, except for one order that had been properly certified for an interlocutory appeal under Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b), and all cross appeals, and issued a published opinion, Group Builders, Inc. v. Admiral Ins. Co., 123 Hawai'i 142, 231 P.3d 67 (App. 2010) (hereinafter, Group Builders).

Following the opinion in Group Builders, Plaintiffs and National stipulated to dismiss the appeal and cross—appeal of issues remaining between them in Case No. 29729.

### I. Background

**A. Underlying Lawsuit**

Hilton Hotels Corp. and its Hawai'i affiliate Hilton Hawaiian Village, LLC (collectively, Hilton) brought the underlying lawsuit in this case against Group Builders and numerous other companies, alleging design and construction

---

[1] The Honorable Glenn J. Kim presided.

[2] National insured Caulking Hawaii, Inc., a subcontractor of Group Builders. Plaintiffs' complaints against National concerned National's refusal to defend and indemnify Group Builders as an additional insured under Caulking's policy.

defects that led to a mold infestation at the new Kalia Tower in the Hilton Hawaiian Village hotel complex. <u>Hilton Hotels Corp., et al. v. Wimberly Allison, Tong & Goo, et al.</u>, Civ. No. 03-1-0813-04 (hereinafter, the Kalia Tower Lawsuit). Group Builders was a subcontractor hired to install the exterior insulation system and sealant, fireproofing, building insulation, and metal wall framing at the Kalia Tower. Hilton's complaint alleged that

> 34. After construction of the Kalia Tower was purportedly completed, the Kalia Tower hotel guest rooms were opened to the public in or about May, 2001. A short time thereafter, in mid-2002, extensive mold growth was discovered in guest rooms.

> 35. On July 24, 2002, following a preliminary evaluation of conditions in the building, [Hilton] closed the guest rooms on floors 5 through 25 of the Kalia Tower to the public. Since the discovery of the mold, [Hilton has] undertaken extensive efforts to ascertain and remediate the causes of the excessive mold growth and the resulting damage to the building and its contents.

Hilton maintained that after it closed the building, an investigation found "numerous material defects in the design and construction." As to Group Builders, Hilton alleged,

> The design, construction, installation, and/or selection of the Kalia Tower building exterior wall finish, which is a stucco-appearing exterior insulation finishing system and sealant ("EIFS"), did not provide an adequate air and/or moisture barrier. In addition, the EIFS was neither designed nor installed in accordance with industry standards and manufacturers' guidelines.

Hilton made five claims against Group Builders: breach of contract, breach of the covenant of good faith and fair dealing, negligence, breach of express and implied warranties, and negligent misrepresentation. Hilton requested, among other relief, "general, special and consequential damages" and damages incurred by Hilton in third-party lawsuits arising from mold at the Kalia Tower.

**B. Group Builders' Insurance Policies**

Group Builders was insured under commercial general liability (CGL) policies written by Tradewind Insurance from October 1, 1999, to October 1, 2000; by Admiral from October 1, 2000 to October 1, 2001, which was subsequently cancelled

December 1, 2000; and by Zurich American Insurance Co. (Zurich) from December 1, 2000, to October 1, 2003. Group Builders maintained umbrella policies through Tradewind between October 1, 1999 and October 1, 2000, and Fireman's Fund Insurance Company (Fireman's Fund), who was not a party to this lawsuit, following the expiration of that policy.

**C. Tender and Denial of Defense**

On May 27, 2003, Group Builders tendered the defense of the Kalia Tower Lawsuit to Admiral. On June 11, 2003, Admiral denied coverage on the basis that "the Kalia Tower building was completed well after this policy was cancelled. No coverage extends." Admiral reserved the right to raise other terms, conditions, and exclusions.

In late February 2004, Tradewind tendered the defense to Admiral and attached a copy of Hilton's First Amended Complaint, dated September 4, 2003. Admiral sent Group Builder's attorney a denial letter on April 7, 2004. The full contents of the denial letter are not part of the record, but a letter from Tradewind's attorney to Admiral's representative noted that the April 2004 denial "simply enclosed [the] June 11, 2003 letter."

On January 18, 2005, Admiral's attorney sent a lengthy letter to Plaintiffs' attorney explaining that "our interpretation of the policy, by its plain meaning, and as applied to known facts and potential, speculative, hypothetical facts, precludes a finding of any potential indemnification obligation, and precludes any duty to participate or contribute to the defense of Group Builders in the pending action." Admiral said Hilton did not allege that the purported "property damage" occurred during Admiral's policy period, but assuming there was damage during the policy period, five provisions of the insurance contract, namely work-in-progress exclusions j.(5) and j.(6), excluded coverage for such damage. Furthermore, Admiral asserted that even assuming that there was property damage sustained during the policy period, such damage was not the result of an

"occurrence," e.g., an accident, which was a requirement for coverage to apply. Lastly, Admiral said Hilton's claims could not be covered by "the products-completed operations hazard"[3] because Group Builders cancelled the policy before it had completed operations on the building.

On May 19, 2006, Hilton, Plaintiffs, and Zurich and Fireman's Fund entered a $6.8 million settlement of the Kalia Tower Lawsuit and related lawsuits. The settlement expressly reserved claims that Group Builders, Tradewind, Zurich, and Fireman's Fund may raise against Admiral, National and Servco. In connection with the settlement, Group Builders assigned Tradewind its claims against Admiral and National, and authorized Tradewind "to sue in the name of Group [Builders], and to the extent any of the [c]laims are not assignable, to recover on Group [Builders'] behalf."

---

[3] 16. "Products-completed operations hazard":

    a. Includ[ing] all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

       (1) Products that are still in your physical possession; or

       (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

          (a) When all of the work called for in your contract has been completed.

          (b) when all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

          (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

       Work that may need service maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

## D. The Instant Action

Plaintiffs filed their complaint in this action on December 13, 2005, and amended the complaint on May 30, 2006. The First Amended Complaint alleged seven counts. Count 1 alleged that Admiral and National breached their contractual duties to defend and indemnify Group Builders. Counts 2 and 3 related to National only. Count 4 alleged that the insurers breached the duty of good faith and fair dealing. Count 5 alleged that Admiral and National breached their duty to contribute to Group Builders' defense and as a result Tradewind is entitled to subrogation for a share of the defense and settlement costs it paid. Count 6 alleged that Admiral breached its duty of good faith that it owed to Tradewind as Group Builders' umbrella insurer. Count 7 requested punitive damages.

On June 9, 2006, Admiral filed an answer to Plaintiffs' First Amended Complaint, a counter-claim against Plaintiffs and a cross-claim against Zurich, seeking reimbursement from Zurich for any amounts to pay or defend or indemnify Group Builders. In October 2007, Admiral's cross-claim against Zurich was dismissed with prejudice.

Plaintiffs, Admiral, and National filed motions for partial summary judgement, asking the circuit court to rule on the issue of whether Admiral had a duty to defend Group Builders in the Kalia Tower Lawsuit, whether Admiral had a duty to indemnify Group Builders, and whether the insurers acted in bad faith in refusing to defend and to indemnify Group Builders. The circuit court held that (1) Admiral had a duty to defend Group Builders; (2) Admiral was entitled to summary dismissal of the claims that Admiral acted in bad faith in refusing to indemnify Group Builders; (3) there was no evidence to support the award of punitive damages; (4) Admiral was entitled to summary dismissal of Plaintiffs' claim that Admiral owed Tradewind, as an umbrella insurer, a duty of good faith and fair dealing; (5) Admiral was

entitled to summary dismissal of Plaintiffs' bad-faith claims relating to the duty to defend; and (6) Admiral was entitled to summary judgment on the issue of the duty to indemnify where "there is no genuine issue of material fact that any property damage as a result of an occurrence took place at the Kalia Tower Project during the Admiral Policy period, which is required for coverage under Admiral's Policy[.]"

On October 10, 2008, Plaintiffs appealed from six orders, and that appeal was docketed as No. 29402. National and Admiral filed separate cross-appeals. This court dismissed all appeals and cross-appeals, except for Group Builders' appeal from the "Order Granting [Admiral's] Motion for Partial Summary Judgment Re: No Duty to Indemnify, Filed on June 25, 2008," which had been certified for interlocutory appeal under HRCP Rule 54(b). The circuit court issued partial final judgments certifying other orders for interlocutory appeal. This appeal concerns Partial Final Judgments dated March 20, 2009 and April 7, 2009.

The March 20, 2009 Partial Final Judgment dismissed with prejudice "[t]he claims in [Count 4, Count 6 and Count 7] of the First Amended Complaint as they relate[d] to [Admiral] only." In these counts, Plaintiffs alleged that Admiral breached its duty of good faith and fair dealing which it owed to its insured Group Builders (Count 4), that Admiral breached its duty of good faith and fair dealing which it owed to Tradewind as an umbrella insurer (Count 6), and that Plaintiffs were entitled to punitive damages (Count 7).

The April 7, 2009 Partial Final Judgment entered a judgment in favor of Plaintiffs and against Admiral, pursuant to and based on the circuit court's December 11, 2006 Amended Findings of Fact, Conclusions of Law and Order,[4] which concluded that Admiral had a duty to defend Group Builders.

---

[4] The Honorable Randal K.O. Lee presided.

**E. The Intermediate Court of Appeals ruling in Appeal No. 29402**

On May 19, 2010, this court issued its opinion in No. 29402, in which it considered whether "the circuit court erred in holding there was no genuine issue of material fact and in dismissing the claims for Admiral's breach of its duty to indemnify Group [Builders], as a matter of law." Group Builders, 123 Hawai'i at 143, 231 P.3d at 68. Admiral's duty to indemnify Group Builders depended on "whether the alleged faulty construction work, giving rise to contractual claims, constitutes an 'occurrence' under a CGL policy." Id. at 145-46, 231 P.3d at 70-71. This court concluded that "construction defect claims do not constitute an 'occurrence' under a CGL policy" and therefore breach of contract claims based on allegations of shoddy performance, and tort claims derived from those breach of contract claims, would not be covered under CGL policies. Id. at 148-49, 231 P.3d at 73-74. Accordingly, this court affirmed the circuit court's order, concluding that Admiral had no duty to indemnify Group Builders under its policy. Id. at 148-49, 231 P.3d at 73-74.

## II. Points on Appeal

**A. Plaintiffs' Appeal**

Plaintiffs contend that the circuit court erred by (1) dismissing their claims that Admiral acted in bad faith in refusing to indemnify Group Builders; (2) dismissing the claim for punitive damages against Admiral; (3) holding that Admiral did not owe a duty of good faith and fair dealing to Tradewind as an umbrella insurer; and (4) dismissing Plaintiffs' claims that Admiral acted in bad faith in refusing to defend Group Builders.

**B. Admiral's Cross-Appeal**

Although Admiral asserts four points on appeal, they all in effect challenge the circuit court's conclusion that Admiral had a duty to defend Group Builders in the Kalia Tower Lawsuit.

## III. Standard of Review

On appeal, an order of summary judgment is reviewed under
the same standard applied by the trial courts. Summary
judgment is appropriate where the moving party demonstrates
that there are no genuine issues of material fact and it is
entitled to judgment as a matter of law.

Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd., 76
Hawai'i 277, 287, 875 P.2d 894, 904 (1994) (citations omitted).

## IV. Admiral's Cross Appeal

### A. Admiral's Duty to Defend

#### 1. Duty to Defend

This court's opinion in No. 29402 held that Admiral had
no duty to indemnify Group Builders, because "construction defect
claims do not constitute an 'occurrence' under a CGL policy."
Group Builders, 123 Hawai'i at 148-49, 231 P.3d at 73-74.  This
ruling, in itself, does not resolve the issue of whether Admiral
had a duty to defend Group Builders in the Kalia Tower Lawsuit
because "the duty to provide coverage [i.e., the duty to
indemnify,] and the duty to defend on the part of an insurer are
separate and distinct."  Dairy Road Partners v. Island Ins. Co.,
Ltd., 92 Hawai'i 398, 412, 992 P.2d 93, 107 (2000) (quoting
Sentinel, 76 Hawai'i at 291, 875 P.2d at 908) (brackets in
original).

"The duty to defend is limited to situations where the
pleadings have alleged claims for relief which fall within the
terms for coverage of the insurance contract.  Where pleadings
fail to allege any basis for recovery within the coverage clause,
the insurer has no obligation to defend."  Hawaiian Holiday
Macadamia Nut Co., Inc. v. Industrial Indem. Co., 76 Hawai'i 166,
169, 872 P.3d 230, 233 (1994) (internal quotation marks omitted).
"[T]he obligation to defend . . . is broader than the duty to pay
claims and arises wherever there is the mere potential for
coverage."  Sentinel, 76 Hawai'i at 287, 875 P.2d at 904)
(quoting Commerce & Indus. Ins. Co. v. Bank of Hawai'i, 73 Haw.
322, 326, 832 P.2d 733, 735, reconsideration denied, 73 Haw. 625,

834 P.2d 1315 (1992)). "This possibility may be remote, but if it exists, the insurer owes the insured a defense." Dairy Road, 92 Hawai'i at 412, 992 P.2d at 107 (brackets and citation omitted).

The burden of proof for Admiral as the insurer refusing the tender of defense is "significantly augmented" when reviewed under the summary judgment standard. Id. Plaintiffs' burden with respect to their motion for summary judgment "was comparatively light, because [they] had merely to prove that a possibility of coverage existed." Id. at 413, 992 P.2d at 108. On the other hand, Admiral was required to prove that it would be "impossible" for Hilton to prevail against Group Builders on the underlying lawsuits on a claim covered by the policies. See Id. at 412, 992 P.2d at 107.

"[W]hether an insurer's refusal to defend was justified must be answered in light of the information available to the insurer at the time it made the refusal." Sentinel, 76 Hawai'i at 288, 875 P.2d at 905. It is of no consequence that this court later determined that the insurer had no indemnification liability. See Tri-S Corp. v. Western World Ins. Co., 110 Hawai'i 473, 497, 135 P.3d 82, 106 (2006) (later judgment in insured's favor in underlying suit "irrelevant" to determination of insurer's duty to defend).

The duty to defend "arises[s] under the terms of the insurance policy, and it is through an interpretation of the terms of the policy that such duties are deemed to be owed." Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund Ins. Co., 117 Hawai'i 357, 369-70, 183 P.3d 734, 746-47 (2007). Accordingly, "[o]ur consideration of the issue before us begins as it must with the relevant provisions of the insurance policy." Sturla, Inc. v. Fireman's Fund Ins. Co., 67 Haw. 203, 207, 684 P.2d 960, 962 (1984).

Under the policy's insuring agreement, Admiral agreed:

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes
legally obligated to pay as damages because of "bodily
injury" or "property damage" to which this insurance
applies. We will have the right and duty to defend the
insured against any "suit" seeking those damages.
However, we will have no duty to defend the insured
against any "suit" seeking damages for "bodily injury"
or "property damage" to which this insurance does not
apply.  We may, at our discretion, investigate any
"occurrence" and settle any claim or "suit" that may
result.
. . . .

b. This insurance applies to "bodily injury" and
property damage" only if:

(1) The "bodily injury" or "property
damage" is caused by an "occurrence"
that takes place in the "coverage
territory"; and

(2) The "bodily injury" or "property damage"
occurs during the policy period.

The policy excluded coverage for "property damage" to

**j. Damage To Property**

(5) That particular part of real property on which
you or any contractors or subcontractors working
directly or indirectly on your behalf are
performing operations, if the "property damage"
arises out of those operations; or

(6) That particular part of any property that
must be restored, repaired or replaced because
"your work" was incorrectly performed on it.

Paragraph (6) of the exclusion did not apply to "property damage
included in the products-completed operations hazard."

The policy defined "property damage" as "[p]hysical
injury to tangible property, including all resulting loss of use
of that property" and provides that "[a]ll such loss of use shall
be deemed to occur at the time of the physical injury that caused
it"; or "[l]oss of use of tangible property that is not
physically injured.  All such loss of uses shall be deemed to
occur at the time of the 'occurrence' that caused it."  The
policy defined an "occurrence" as "an accident, including

11

continuous or repeated exposure to substantially the same general harmful conditions."

An amendment to the policy provided that "property damage" will be covered under the policy if it "occurs during the policy period and was not prior, to the policy period, known to have occurred by any insured listed . . . [and] includes any continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period."

### a. Cancellation of policy waived defense of claims as a result of occurrence after December 1, 2000.

Admiral's first argument on appeal is that by cancelling the policy, Group Builders "specifically released Admiral from any obligation to indemnify losses that occurred after December 1, 2000." Admiral relies on the policy cancellation, which reads, "No claims of any type will be made against [Admiral], its agents or its representatives under this policy for losses which occur after the date of cancellation shown above [12/01/00]." Neither the cancellation document nor the policy defines what is meant by "loss." However, "loss" is commonly defined as "[t]he amount of financial detriment caused by . . . an insured property's damage, for which the insurer becomes liable." Black's Law Dictionary 1030 (9th ed. 2009). Admiral asserts that the cancellation waived Group Builders' right to receive a defense by Admiral for claims for property damage as a result of an occurrence after December 1, 2000.

### b. Complaint did not specify when "occurrence" causing property damage took place.

Under the policy, Admiral agreed to indemnify Group Builders against losses for property damage "caused by an 'occurrence'" which "occurs during the policy period." Accordingly, Group Builders had an occurrence policy: "under an occurrence policy, the event that triggers potential coverage is the sustaining of actual damage by the complaining party and not the date of the act or omission that caused the damage."

Sentinel, 76 Hawai'i at 288, 875 P.2d at 905. We agree with Admiral's position that in order for property damage at Kalia Tower to trigger coverage under Admiral's policy, "there would have to be a possibility that the mold was present during those two months."

Admiral maintains that "the uncontroverted proof in this case is that it is a scientific impossibility that mold could have grown at the Kalia Tower prior to December 1, 2000." However, the insurer points as "proof" to an April 17, 2008 deposition done by Hilton for the Kalia Tower lawsuit, in which Hilton's expert testified that the mold growth which caused damage throughout the hotel was a result of air, a "food source" (in this instance, drywall paper), and water coming in contact with one another. Admiral argues that any property damage could not have occurred during the policy period "because the water was not present until the building was closed up and the air conditioning was turned on."

Admiral's reliance on a deposition taken in 2008, almost five years after it refused to defend, ignores that the duty to defend arises, not during pre-trial discovery, but when the complaint is tendered. See Dairy Road, 92 Hawai'i at 413, 992 P.2d at 108. We evaluate "whether an insurer's refusal to defend was justified . . . in light of the information available to the insurer at the time it made the refusal." Sentinel, 76 Haw. at 288, 875 P.2d at 905. While the cause and timing of the mold growth supports Admiral's position that there was no property damage during the policy period, the expert's opinion was obtained well after Admiral denied the defense.

Contrary to Admiral's assertion that Hilton alleged in the Kalia Tower Lawsuit that Group Builders' work "resulted in property damage from the growth of mold in the Kalia Tower after construction of the Kalia Tower was complete," Hilton's complaint does not specify when the mold growth began, when any property damage occurred, or what caused the mold to grow. The Kalia

13

Tower Lawsuit complaints noted only that the mold was "discovered" in mid-2002. Cf. Sentinel, 76 Hawai'i at 288, 875 P.3d at 905 (complaint similarly did not specify timing of damages). At the time the tender of defense was made and refused, the source of the mold had not been alleged, and, it appears from the record, had not been determined by Hilton's investigation. Admiral itself admits that "[t]he only information presented to Admiral at the time of the tender was a copy of the Hilton Complaint[,]" and points out no other facts known at the time upon which it based the denial of the defense.

### c. Although subsequently determined that Hilton's claims were not covered by Admiral's CGL policy, there was possibility of coverage when Admiral denied defense.

Admiral appears to acknowledge that the uncertainty over when the mold damage occurred is a disputed factual issue that would preclude summary judgment, but maintains that even if property damage were present during the Admiral policy period, those damages were not the result of occurrences or were excluded by provisions[5] of the policy. For purpose of this appeal, we must assume that property damage may have occurred at the Kalia Tower during the policy period. See Dairy Road, 92 Hawai'i at 418, 992 P.2d at 113 (duty to defend hinges on whether "allegations set forth in the complaint, which if true, establish the possibility of coverage"). Two questions remained at the time of the denial of the defense: (1) whether damages caused by defective workmanship constituted an "occurrence" within the meaning of the standard-form CGL policy and, (2) if so, whether the damage could be excluded here under the works-in-progress exclusions, j.(5) and j.(6).

---

[5] Although Admiral's motion for summary judgment on the duty to indemnify identified exclusions j.(5), j.(6), k, l and m, as being applicable to Group Builders' claim, Admiral abandons the applicability of exclusions k, l, and m on appeal.

**i. Circuit court based its decision on duty to defend on holding from <u>Sentinel Insurance Co. v. First Insurance Co.</u>**

Although the circuit court does not provide a citation in its order granting Plaintiffs partial summary judgment[6] on the duty to defend, the court's later-entered Findings of Fact/Conclusions of Law (FOF/COL) regarding the bad-faith claims make clear that the court upheld Admiral's duty to defend under "<u>Sentinel</u> . . . and its progeny." Plaintiffs argue that <u>Sentinel</u> required an insurer to defend "where Hawaii appellate cases have not conclusively answered coverage issues impacting the duty to defend."

In <u>Sentinel</u>, Sentinel and First Insurance insured the developers of an apartment complex under a series of CGL policies, which alternated over the course of seven years. 76 Hawai'i at 284-85, 875 P.2d at 901-02. After water infiltration damaged the apartment building, the homeowner's association sued the developers and contractors, alleging defects in design, construction, and/or materials. <u>Id.</u> at 284, 875 P.2d at 901. The developers tendered the defense to both insurers. <u>Id.</u> at 284, 875 P.2d at 901. Sentinel agreed to defend under a reservation of rights, while First Insurance refused to defend or indemnify, instead maintaining Sentinel was solely responsible

---

[6] The circuit court concluded in its order granting partial summary judgment to Plaintiffs:

> 14. Construing the policy liberally in favor of the insured and resolving any ambiguities against the insurer, the Court finds that because of the uncertainty as to when the property damage occurred, as to whether the property damage arose out of Group Builders' operations, or as to whether Group Builders' work was incorrectly performed, a possibility of coverage, however remote, exists where the insurer owed the insured a duty to defend.

Uncertainty over when the property damage occurred and whether the work was incorrectly performed are factual matters that would have been decided had the Kalia Tower Lawsuit come to trial. Whether the property damage "arose out of Group Builder's operations" would affect the court's application of exception j.(5) and j.(6).

for the entire losses to the building because it was the "'insurer on risk' at the time of manifestation" of the damages. Id. at 290, 875 P.2d at 907. The homeowners's association and building owners settled the case, and Sentinel brought an action for declaratory relief against First Insurance to recover the cost of defending the lawsuit as well as a portion of the settlement paid. Id. at 286, 875 P.2d at 903.

The supreme court considered, inter alia, what event would trigger coverage in a third-party liability insurance case and, more specifically, "what trigger should apply where the loss continues and progresses over successive policy periods involving different insurers." Id. at 290, 875 P.2d at 907. The supreme court found "a notable dispute nationwide" on those issues. Id. After concluding that First Insurance had a duty to defend because these questions were open questions of law, the supreme court held that the injury-in-fact, not manifestation of the damages, was the relevant event triggering coverage and a continuous trigger might apply, exposing successive insurers to liability. Id. at 298, 875 P.2d at 915. The court remanded the case with instructions for the trial court because factual issues remained that would affect the application of the injury-in-fact test.

In affirming the trial court's conclusion that First Insurance had breached its duty to defend, the supreme court said it did not need to answer "what event(s) triggered coverage in this case for property damage under the First Insurance policies" nor whether the insurers would be jointly and severally liable for damages, although it later answered these questions Id. at 290, 875 P.2d at 907. "The mere fact that the answers to those questions in this jurisdiction were not then and are not presently conclusively answered demonstrates that, based on the allegations in the underlying action, it was possible that the [insured] would be entitled to

indemnification under the First Insurance policies." Id. Plaintiffs rely on this sentence in demanding a defense.

A dozen years after Sentinel, the supreme court said that Sentinel stood for the proposition that "determining breach of duty to defend does not require resolution of open questions in the underlying case because the fact that, based on the allegations in the complaint, the questions are open in itself demonstrates the possibility that the insured will be entitled to coverage." Tri-S Corp., 110 Hawai'i at 495 n.10, 135 P.3d at 104 n.10 (citing Sentinel, 76 Hawai'i at 290, 875 P.2d at 907)) (emphasis added).

### ii. **Sentinel required a defense.**

In a letter from the Plaintiffs' attorney to Admiral dated September 22, 2004, Plaintiffs asked Admiral to reconsider its coverage decision and pointed out the Sentinel rule. Admiral rejected application of the Sentinel rule. In a letter to a mediator in the Kalia Tower Lawsuit, Admiral's attorney argued, "To employ Tradewinds' wildly broad application of Sentinel would require absurd results, such as preventing an insurer from ever relying on unambiguous policy language that clearly precluded coverage because a Hawaii appellate court had not addressed it, even where the reason the court had not addressed it was that no one had yet chosen to contest the clarity of the policy terms on the issue."

Sentinel was clear that "[a]ll doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured." Sentinel, 76 Hawai'i at 287, 875 P.2d at 904 (quoting Trizec Properties, Inc. v. Biltmore Constr. Co., 767 F.2d 810, 812 (11th Cir. 1985) (some brackets omitted). Admiral has not distinguished the Sentinel holding on appeal.

Admiral owed a defense because the courts were split as to whether construction defect claims constituted an "occurrence" under a CGL policy at the time Admiral refused to undertake a defense on behalf of Group Builders. See Group

Builders, 123 Hawai'i at 148, 231 P.3d at 73 (noting "a split of authority on the issue").

### iii. Work-in-progress exclusions.

Admiral argues that even if there was "property damage" as a result of an occurrence, the business-risk exclusions of the Admiral policy excludes coverage for any of the damages alleged. However, Admiral repeatedly acknowledges that "there is no Hawaii case law interpreting the scope of exclusions j.(5) and j.(6)." Admiral points to other jurisdictions that have interpreted the same exclusionary language in the insurer's favor as well as other cases regarding the purpose of CGL policies, but Admiral fails to note citations to the contrary in other jurisdictions, which would lead to the conclusion that the interpretations of exclusions j.(5) and j.(6)--although a standard industry form--continue to vary.

Exclusions j.(5) and j.(6) are a subset of business-risk exclusions called the "work-in-progress exclusion" or "ongoing operations" exclusions. 9A Couch on Insurance § 120:20 (3d ed. 1997).

> Exclusion j.(5) has generally been applied to preclude coverage for damages to particular real property resulting from or arising out of the ongoing operations of the insured. The purpose of exclusion j.(6) is to preclude coverage for the costs to repair or replace particular work which is discovered to be defective or otherwise incorrectly performed while the insured is still performing its work.
>
> Both of these exclusions are limited in their application by both time and scope. In order for these exclusions to apply, the claims must arise at the time the insured is actually performing the work on the property. Conversely, the exclusions do not apply to claims which arise after the insured's operations are complete. These exclusions will further only apply to that 'particular part' of the subject property where the operations were being performed by the insured."

Id.

Even if we assume, based on the fact that Group Builders' subcontract called for completion of the project in May 2001, that Group Builders' was in the middle of construction when Admiral "came off the risk" in December 2000, it is still not

18

certain that these exclusions could be interpreted in Admiral's favor. Admiral's reading of the exclusions--that because Group Builders had ongoing operations, the exceptions applied--ignores the words "that particular part."

Admiral states that ongoing operations exclusions have been held to be unambiguous and indeed some courts have so held. See, e.g., Transportation Ins. Co. v. Piedmont Const. Group, LLC, 686 S.E.2d 824, 827 (Ga. App. 2009) (citing Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71 (Ga. App. 1997)). But other jurisdictions have interpreted section j.(5) and j.(6) of the standard form as being ambiguous, and have accordingly construed them against the insurer. See Beaverdam Contracting v. Erie Ins. Co., 2008 WL 4378153, at *8-9 (Ohio App. 2008) (citing Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877 (Minn.2002) and Pekin Ins. Co. v. Miller, 854 N.E.2d 693 (Ill. App. 2006)).

Admiral cites to a number of cases that read "that particular part" broadly: Shelby Ins. Co. v. Ne. Structures, Inc., 767 A.2d 75,77 (R.I. 2001) (holding that exclusions j.(5) and j.(6) barred coverage because temporary bracing "cannot be separated from the construction of the remainder of the structure for purposes of recovery under the insurance policy"); Bituminous Cas. Corp. v. No. Ins. Co. of New York, 548 S.E.2d 495, 496 (Ga. App. 2001) (rejecting narrow interpretation of j.(5) and j.(6) exclusions, where contractor was reinstalling defective roofing and protective tarp blew away causing flooding inside home); Grinnell Mut. Reinsurance Co. v. Lynne, 686 N.W.2d 118, 125-26 (N.D. 2004) (rejecting narrow interpretation of j.(5) exclusion to find no coverage where house collapsed due to faulty supports lifting house while new foundation was laid); Auto Owners Ins. Co. v. Chorak & Sons, Inc., 2008 WL 3286986, at *3 (ND. Ill. 2008) (house slid off foundation resulting in "catastrophic damage" where contractor worked on a two-inch by six-inch wooden plate at the top of the foundation); Journeyman Prof'ls, Inc. v. American Family Ins. Co., 2006 WL 3041107, at *3 (Ohio App. 2006)

(excluding damages to wall of building caused by faulty construction of roofing trusses).

Admiral does not acknowledge that the clause has been narrowly interpreted in other jurisdictions to meaning damages necessitating repair or replacement of the defective workmanship only. See, e.g., Mid-Continent Cas. Co., v JHP Dev., Inc., 557 F.3d 207, 210, 215 (5th Cir. 2009) ("the exclusion does not bar coverage for damage to parts of a property that were the subject of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property") (coverage applied where contractor's failure to water-seal exterior damaged interior finishes, drywall, electrical wiring); Hathaway Dev. Co., Inc. v. Am. Empire Surplus Lines Ins. Co., 686 S.E. 2d 855, 863 (Ga. App. 2009), aff'd, 707 S.E.2d 369 (2011) (exclusion did not apply where contractor's undersized pipes ruined site preparation work done to date); Piedmont, 686 S.E.2d at 827 ("'that particular part' in the exclusions referred not to [the building] as a whole, but 'only to the room and the plumbing on which [the subcontractor] was working prior to the fire starting'").

The Sixth Circuit, addressing j.(6), explained:

> The opening words of the exclusion--namely, "[t]hat particular part"--are trebly restrictive, straining to the point of awkwardness to make clear that the exclusion applies only to building parts on which defective work was performed, and not to the building generally. And we also agree that "part," as used in this exclusion, means the "distinct component parts" of a building-things like the "interior drywall, stud framing, electrical wiring," or, as here, the foundation. The (j)(6) exclusion therefore applies only to the cost of repairing or replacing distinct component parts on which the insured performed defective work.

Fortney & Weygandt, Inc. v. American Mfrs. Mut. Ins. Co., 595 F.3d 308, 311 (6th Cir. 2010) (under Ohio law, insurer owed general contractor defense against allegations that construction defect in foundation necessitated building's demolition) (citation omitted).

Hilton's complaint did not specify which installation was defective, nor did it specify what parts of the Kalia Tower were damaged. Thus, there was a possibility that the exclusions, if narrowly read, would not exclude coverage of all Hilton's claims against Group Builders.

We do not need to decide how to interpret "that particular part" here. See Sentinel, 76 Hawai'i at 290, 875 P.2d at 907; Tri-S Corp., 110 Hawai'i at 495 n.10, 135 P.3d at 104 n.10. The insurer carries the burden of proof that an "exclusionary clause applies." Tri-S Corp., 110 Hawai'i at 484, 135 P.3d at 93 (2006) (citing Sentinel, 76 Hawai'i at 297, 875 P.2d at 914). In the absence of clear authority as to the interpretation of this phrase, Admiral could not prove that these exclusions applied to the Hilton's alleged damage. See York v. Sterling Ins. Co., 494 N.Y.S.2d 243, 244 (N.Y. App. Div. 1985) (finding duty to defend applied where "insurer has not met its burden of proving that its construction is the only one which can fairly be placed on the exclusion"). Thus, where the exclusions did not clearly exclude coverage, there was a possibility of coverage such that Admiral had a duty to defend.

**B. Plaintiffs' Appeal**

> **1. The circuit court did not err in dismissing Count Four, which alleged that Admiral acted in bad faith against Group Builders.**

Plaintiffs' first and fourth points of error claim the circuit court erred in dismissing Count Four of Plaintiffs' complaint, which alleged that Admiral acted in bad faith in denying Group Builders' coverage. In its April 3, 2007 Amended FOFs/COLs, the circuit court found that based on Sentinel "and its progeny," Admiral's "duty to defend is not an 'open question of law'" but that the duty to indemnify was an open question of law. The circuit court cited to Enoka v. AIG Hawai'i Ins. Co., Inc., 109 Hawai'i 537, 128 P.3d 850 (2006), which held that "where an insurer denies the payment of no-fault benefits based

21

on 'an open question of law,' there is 'obviously no bad faith on the part of [the insurer] in litigating that issue.'" Id. at 552, 128 P.3d at 865 (quoting Colonial Penn. Ins. Co. v. First Ins. Co. of Hawaii, Ltd., 71 Haw. 42, 43-44, 780 P.2d 1112, 1114 (1989)). The circuit court found that the issue of indemnity was an open question and Admiral's interpretation was reasonable and therefore did not constitute bad faith. The circuit court made these findings, acknowledging that it had not adjudicated the issue of indemnity, which it later did on September 23, 2008.

On June 13, 2008, Admiral filed its "Motion For Partial Summary Judgment As To Count Four To Plaintiff's First Amended Complaint Filed On May 30, 2006." Judge Kim granted the motion, stating:

> And I'm going to grant it basically 'cause in this Court's view, its almost law of the case. . . . I think it just about necessarily follows in this case, from everything that's been presented to me and given Judge Lee's prior ruling, granting Admiral's summary judgment on the bad faith issue on indemnification. I just don't see a genuine issue of material fact here on the bad faith claim in Count 4 on the duty to defend.

**a. Separately deciding issue of bad faith regarding indemnification and defense.**

The duty to defend and the duty to indemnify are two distinct duties. Bad faith in handling a third-party claim may include "bad faith surrounding an insurer's duty to defend, to settle, or investigate a third-party claim[.]" Honbo v. Hawaiian Ins. & Guar. Co., Ltd., 86 Hawai'i 373, 378, 949 P.2d 213, 218 (App. 1997). Although Plaintiffs contend that an insurer's bad faith cannot be "applied separately to the duty to defend and the duty to indemnify," Plaintiffs provide no citation for such a proposition and we find no case law that indicates that they could not be handled at different times. Plaintiffs claim that the "piecemeal dismissal of the bad faith claims" led the court to apply the "open question of law" rule enunciated in Enoka, which they claim is not valid law in the third-party insurance context.

Plaintiffs, citing to Honbo, maintain that there is a distinction between first-party bad faith and third-party bad faith,[7] inferring that there is a different standard for measuring bad faith in handling first-party and third-party insurance claims. Honbo differentiates between first-party and third-party bad faith claims "because each arise out of different sets of circumstances." 86 Hawai'i at 377, 494 P.2d at 217. Honbo made such a distinction to explain why a particular statute of limitations, HRS § 294-36(a)(4), did not apply to first-party bad-faith claims against a no-fault insurer, but would apply to a third-party bad-faith claim. 86 Hawai'i at 377-78, 949 P.2d at 217-18. Honbo does not address what is the appropriate standard to be applied in analyzing bad faith in handling a third-party insurance claim.

### b. The "reasonableness" standard.

Admiral cites the standard for evaluating a bad-faith claim enunciated in the first-party insurance cases. Best Place, 82 Hawai'i at 132, 920 P.2d at 346.[8] We agree with the federal District Court in Hawai'i that applied the Best Place standard to a third-party case, specifically one that alleges bad faith in handing a CGL claim, in Allen v Scottsdale Ins. Co., 307 F.Supp. 2d 1170 (D. Haw. 2004).

---

[7] "A 'third-party claim' is one where the insurer contracts to defend the insured against claims made by third parties against the insured and to pay any resulting liability, up to the specified dollar limit. In contrast, a 'first-party claim' refers to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured." Best Place, Inc. v. Penn America Ins. Co., 82 Hawai'i 120,124 n.4, 920 P.2d 334, 338 n.4 (1996). While this court has categorized CGL, director's liability, errors and omissions insurance, etc. as third-party insurance, one treatise considers more specifically the benefits owed under the contract before categorizing the breaches. Indemnification is a benefit going to a third party, "[t]he right to a defense is a first-party benefit, protecting the insured against defense costs." William T. Barker & Ronald D. Kent, New Appleman Insurance Bad Faith Litigation § 3.08[3] at 3-41 (2d ed. 2011).

[8] Plaintiffs do not suggest the standard to be applied.

The analysis of bad faith in <u>Best Place</u> began with the premise that "conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith." <u>Best Place</u>, 82 Hawaiʻi at 133, 920 P.2d at 347. The supreme court elaborated:

> Under the <u>Gruenberg</u> [<u>v. Aetna Ins. Co.</u>, 510 P.2d 1032 (Cal. 1973)] test, the insured need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages under the <u>Gruenberg</u> test. However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. Rather, the decision not to pay a claim must be in 'bad faith.' California Shoppers Inc. v. Royal Globe Ins. Co., 175 Cal.App.3d 1, 221 Cal.Rptr. 171 (1985) (bad faith implies unfair dealing rather than mistaken judgment).

<u>Id.</u> (citations omitted). <u>Guajardo v. AIG Hawaiʻi Ins. Co.</u>, 118 Hawaiʻi 196, 206, 187 P.3d 580, 590 (2008), another first-party case, stated: "A reasonableness standard governs bad faith claims." <u>See</u> <u>also</u> 14 Couch on Insurance § 205:4 at 205-14 (3d ed. 2001).

As to the rule of reasonableness, the Hawaiʻi Supreme Court has held that an interpretation of an insurance contract based on "open questions of law" was presumptively reasonable and therefore could not be the basis of a bad faith claim. <u>Enoka</u>, 109 Hawaiʻi at 552, 128 P.3d at 865. The supreme court explained, "[B]ad faith implies unfair dealing rather than mistaken judgment." <u>Id.</u> The circuit court applied the proper standard in dismissing Plaintiffs' bad faith claims.

**2. The circuit court did not err in dismissing the claim for punitive damages against Admiral as a matter of law.**

Plaintiffs' second point on appeal is that the court erred by "sua sponte dismissing the punitive damage claim." In

24

its March 6, 2007 motion for partial summary judgment on the bad-faith claims, Admiral moved the court to dismiss the punitive claims against it. Admiral argued there could be no punitive damages in the absence of bad faith.

Plaintiffs argue there were genuine issues of material fact relating to Admiral's intent but fails to point to anything in the record demonstrating willfulness, wantonness and recklessness on Admiral's part. Amfac, Inc. v. Waikiki Beachcomber Investment Co., 74 Haw. 85, 139 n.23, 839 P.2d 10, 37 n.23 (punitive damage are warranted where the party has acted in "such a wilful, wanton or reckless manner as to result in a tortious injury"). The circuit court properly dismissed Plaintiffs' punitive damages claim.

### 3. The circuit court did not err in dismissing the bad-faith claims brought by Tradewind as an umbrella insurer.

In its third point of error, Plaintiffs allege that the circuit court erred in dismissing its Count 6, which alleges that Admiral "as [a] primary insurer[] owed [Tradewind] duties of good faith and fair dealings, as an umbrella insurer."

The duty of good faith and fair dealing is implied from the terms of the insurance contract. Best Place, 82 Hawai'i at 132, 920 P.2d at 346. There was no contract between Admiral, the primary insurer, and Tradewind, the excess insurer. Hawai'i law does not provide for bad faith claims based on an insurance contract brought by a third-party to that contract. Weber v. Indemnity Ins. Co. of N. America, 345 F. Supp. 2d 1139, 1150 (citing Simmons v. Puu, 105 Hawai'i 112, 122-23, 94 P.3d 667, 677-78). But cf. Hough v. Pacific Ins. Co., Ltd., 83 Hawai'i 457, 468 n.15, 927 P.2d 858, 869 n. 15 (1996) (allowing bad faith claims against workers' compensation insurer by employee because employee is an intended beneficiary of the insurance).

Because Admiral did not owe a direct duty of good faith and fair dealing to Tradewind, the circuit court did not err as to Count Six.

## VI. Conclusion

Therefore, we affirm the April 7, 2009 Partial Final Judgment and the March 20, 2009 Partial Final Judgment both entered in the Circuit Court of the First Circuit.

DATED:  Honolulu, Hawai'i, April 15, 2013.

On the briefs:

Wesley H. Sakai, Jr.
(Bendet, Fidell, Sakai & Lee)
Melvyn M. Miyagi
Angela T. Thompson
(Watanabe & Ing)
for Plaintiffs-Appellants/Cross-
Appellees/Cross-Appellees
Group Builders, Inc. and Tradewind
Insurance Company, Ltd.

Joseph F. Kotowski, III
and
Allen R. Wolff
(Olshan Grundman Frome Rosenzweig &
Wolosky)
for Defendant-Appellee/Cross-
Appellant/Cross-Appellee
Admiral Insurance Company.

Gary W.K. Au Young
and
Scott Noya
(Daley & Heft)
for Defendants-Appellees/Cross-
Appellees/Cross-Appellants National
Interstate Insurance Company,
Servco Insurance Services Corp.,
National Interstate Insurance
Company of Hawaii, Inc.

Presiding Judge

Associate Judge

Associate Judge